# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| IN RE CHARTER COMMUNICATIONS, INC., | ) | MDL DOCKET NO. 1506 |
| SECURITIES LITIGATION | ) | ALL CASES |

----------------------------------------------------------------------------------------------------------

| | | |
|---|---|---|
| STONERIDGE INVESTMENT PARTNERS | ) | |
| LLC, Individually and On Behalf of All Others | ) | Consolidated Case |
| Similarly Situated, | ) | No. 4:02-CV-1186 CAS |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CHARTER COMMUNICATIONS, INC., | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This consolidated multi-district litigation came before the Court on May 23, 2005. Lead

Plaintiff, StoneRidge Investment Partners LLC ("StoneRidge") seeks final approval of the settlements

("Settlement") reached between it and Charter Communications, Inc. ("Charter" or "Company");

certain individual officers and directors of Charter; and Arthur Anderson LLP ("Andersen"),

Charter's outside auditor. The Settlement provides for payment of $146,250,000, consisting of

$66,250,000 in cash (of which $2,250,000 is being paid by Andersen); $40,000,000 in Charter

common stock; and $40,000,000 of Charter warrants. Charter and Plaintiff amended the Stipulation

of Settlement to allow the Company, the option, at its sole discretion, to satisfy its payment obligation

under the Stipulation with cash rather than issuing the Settlement Securities in amounts up to and

including $80 million on a dollar-for-dollar basis. (Doc. 330.) In addition, Charter has agreed to

certain corporate governance reforms intended to avoid the recurrence of the problems that led to this lawsuit. To effectuate this Settlement, Lead Plaintiff also seeks final certification of the settlement class of investors in Charter common stock during the period November 8, 1999 through August 16, 2002 ("Class Period"). Based on the Court's review of the file, the record and proceedings herein, and for the reasons stated below, the Court will grant the relief sought by Lead Plaintiff.

The Court is advised that according to a study by <u>Bloomberg News</u>, the Settlement falls within the top 25 securities fraud class action settlements of all time. <u>See</u> Supplemental Compendium ("Supp. Comp."), Ex. 3 and as detailed in the Declaration of Marc I. Gross dated April 14, 2005 ("Gross Decl."). The Court concludes the Settlement is fair, reasonable and adequate, and warrants approval.

The Court notes in particular, the Settlement was reached by well informed and experienced counsel who conducted a thorough investigation of the claims, including interviews with over 20 former Charter employees, several defendants, and analysis of several hundred thousand pages of documents produced by the Company. Gross Decl. ¶¶ 33-43, 71-77. Negotiations with Charter and the individual defendants were arms' length and supervised by a retired federal judge experienced in these matters acting as mediator. The parties met on 7 days over the course of 6 months before reaching an agreement in principle. Gross Decl. ¶¶ 78-88. Negotiations continued over the precise terms of the agreement, as Lead Counsel negotiated measures designed to protect the value of the securities being contributed to the Settlement by Charter. Gross Decl. ¶¶ 89-100.

Lead Plaintiff had the benefit of a restatement of Charter's financial reports and guilty pleas entered by several Charter officers to charges that they schemed to inflate the Company's customer

growth rate.  Gross Decl.¶ 26-28.  However, there were substantial risks in proving that defendants' accounting issues were the result of deliberate misconduct rather than negligent mismanagement. There were similar risks in proving that the customer overcount was material to investors, since Charter's write-off of a significant number of accounts in February 2002 resulted in its stock price rising, not falling.  Gross Decl. ¶¶ 110-180.

The Settlement represents upwards of 32% to 93% of Lead Plaintiff's estimate of *damages* that likely would have been recovered for those Class Members who are likely to file claims on the Settlement Fund.  Gross Decl. ¶¶ 181-97.

There was a significant risk that damages would be limited to the two declines of Charter's stock price ($0.70 per share) that followed disclosures at the end of the Class Period (and not a third decline following a disclosure regarding lower customer growth rate that occurred 9 months earlier). If damages were so limited, the recovery represents over 100% of the losses for those Class Members likely to file claims on the Settlement Fund.  Gross Decl. ¶ 198.

The Settlement is also remarkable given Charter's precarious financial condition. The Company has been losing money and bleeding cash, hampered by its $18 billion debt load.  Its stock price has dropped to around $1.50 per share.   The insurance policies covering the individual defendants have been exhausted.  Charter's former auditor, settling defendant Andersen, is defunct and facing billions in claims arising out of its failed audits for other companies.  Gross Decl. ¶¶ 201-06.

As set forth below, given these circumstances, this Court believes approval of the Settlement is more than appropriate.  In re BankAmerica Corp. Secs. Litig., 210 F.R.D. 694, 701 (E.D. Mo. 2002); In re Wireless Tel. Fed. Cost Recovery Fees Litig., 396 F.3d 922, 934 (8th Cir. 2005).

The Plan of Allocation also warrants approval. The Plan was formulated by Lead Plaintiff and Lead Counsel based on consultation with a valuation firm that also assisted in analysis of recoverable damages during settlement negotiations. The Plan factors in Lead Counsel's assessment of the strength of claims during several segments of the Class Period, and also the amount of damages per share that could be linked to such claims. Such amounts varied during the Class Period as different aspects of the accounting and overcount schemes commenced, and certain aspects of those schemes were arguably disclosed to the market.

Pursuant to this Court's Order of Preliminary Approval dated February 15, 2005, over 500,000 notices were mailed to potential Class Members, and Summary Notice was published in The Wall Street Journal and Business Wire. See Declaration of Michael Rosenbaum, Supp. Comp., Ex.1. Among other things, the Notice described the background of the case; the terms of the proposed Settlement and Plan of Allocation; the hearing scheduled for May 23, 2005 to consider approval of these matters; Lead Plaintiff's request for payment of attorneys' fees and expenses; and Class Members' right to opt-out, object to or file a claim on Settlement.

I.      **BACKGROUND**

Charter is one of the nation's largest providers of cable services, with over six million customers. Lead Plaintiff asserted that during the Class Period, the Company inflated its "internal" customer growth by improperly deferring the termination of a significant number of customers who had either requested termination, or who were significantly late in their payments. As a result, Charter reported industry-leading customer growth rates from marketing efforts (rather than acquisitions of other cable companies), thus giving the false impression that Charter was successfully

fending off competition from satellite tv providers. But for this inflation, Lead Plaintiff charged, Charter would have shown no internal customer growth. Gross Decl. ¶¶ 45-48, 127.

Lead Plaintiff also charged that Charter inflated its operating cash flow by, among other things, improperly "capitalizing," i.e., spreading over several years, certain customer service representative costs, rather than recognizing those costs in the year incurred. As a result, Charter reported operating cash flow growth of 12-14%, again at the high end of the industry. But for the accounting scheme, Lead Plaintiff charged, Charter's reported growth of operating cash flow would have been a mediocre 6%. Gross Decl. ¶¶ 27, 49-51, 112. By inflating its reported results, Charter caused its stock price to be artificially inflated, resulting in damages to members of the Class who overpaid for their shares.

In addition to Lead Plaintiff's own investigation, there was support for the customer overcount claims in the Indictment filed in July 2003 against four senior officers of Charter. The Indictment charged that these officers engaged in a campaign starting in July 2001 to delay the termination of accounts until after the end of a quarter in order to meet Wall Street expectations. Gross Decl. ¶ 28. The Indictment also charged that Charter's former COO and CFO engaged in a "kickback" scheme with Scientific-Atlanta and Motorola in late 2000 intended to inflate the Company's financial results. Id.

Additional support for Lead Plaintiff's accounting claims was provided by Charter's restatement of its financial results for 2000, 2001 and the first 9 months of 2002. As a result of the restatement, the Company's reported operating cash flow was reduced by over $400 million. Gross Decl. ¶¶ 26, 51.

Despite these admissions and other evidentiary support, Lead Plaintiff faced risks in ultimately proving that defendants knowingly misled investors ("scienter"), and that their misconduct contributed to the losses sustained by Class members ("loss causation"). Among other things, the declines in Charter's stock price that were attributable to revelations regarding defendants' misconduct were quite small, and arguably "confounded" by other Company related news that required allocation of the declines between portions related, and unrelated, to the fraud. Moreover, regardless of Lead Plaintiff's ability to obtain a judgment against Charter, the Company's dire financial condition raised collection concerns. Gross Decl. ¶¶ 201-06.

By the same token, collection of any judgment against Anderson was highly problematic, given that the accounting firm is no longer operating, and is facing significant exposure to claims in many other cases. Gross Decl. ¶ 103.

Nonetheless, negotiations over six months with the Charter-related defendants, supervised by the mediator, resulted in the recovery of $144,000,000 in cash and securities. Subsequent negotiations led to an additional recovery of $2,250,000 from Andersen. These recoveries represent a significant portion of the damages Lead Plaintiff might have recovered if this case had gone to trial. Gross Decl. ¶¶ 181-199.

## II.     DISCUSSION

### A.     PROPOSED SETTLEMENT

There is a long-standing policy favoring settlements of civil actions in federal courts. See e.g., Williams v. First Nat'l Bank, 216 U.S. 582, 595 (1910); Holden v. Burlington Northern, Inc., 665 F. Supp. 1398, 1405 (D. Minn. 1987). This policy is especially applicable to class action litigation:

> In the class action context in particular, 'there is an overriding public interest in favor of settlement.' <u>Cotton v. Hinton</u>, 559 F.2d 1326, 1331 (5th Cir. 1977). Settlement of the complex disputes often involved in class actions minimizes the litigation expenses of both parties and also reduces the strain such litigation imposes upon already scarce judicial resources.

<u>Armstrong v. Board of Sch. Directors</u>, 616 F.2d 305, 313 (7th Cir. 1980); <u>see also</u> <u>Little Rock Sch. Dist. v. Pulaski County Special Sch. Dist.</u>, 921 F.2d 1371, 1391 (8th Cir. 1990) (the policy in favor of settlement is so strong that such agreements are "presumptively valid"). "It is the surety of settlement that makes it a favored policy in dispute resolution as compared to unknown dangers and unforeseen hazards of litigation." <u>In re Wireless Tel. Fed. Cost Recovery Fees Litig.</u>, MDL 1559, Master Case No. 4:03-md-01559, 2004 U.S. Dist. LEXIS 23342, at *31 (W.D. Mo. Apr. 20, 2004) (citation omitted); <u>BankAmerica</u>, 210 F.R.D. at 701 (recognizing that it is "'proper to take the bird in the hand instead of a prospective flock in the bush.'") (citation omitted). As the court in <u>Wireless Tel.</u>, 396 F.3d at 934 stated:

> We have recognized that a class action settlement is a private contract negotiated between the parties. <u>Christina A. ex rel. Jennifer A. v. Bloomberg</u>, 315 F.3d 990, 992 (8th Cir. 2003). Rule 23(e) requires the court to intrude on that private consensual agreement merely to ensure that the agreement is not the product of fraud or collusion and that, taken as a whole, it is fair, adequate, and reasonable to all concerned. <u>Id.</u>

Federal Rule of Civil Procedure 23(e) requires this Court to approve a dismissal or compromise of an action brought pursuant to Rule 23. This Court is a fiduciary of the rights of absent class members. <u>See</u> <u>Petrovic v. Amoco Oil Co.</u>, 200 F.3d 1140, 1148 (8th Cir. 1999); <u>Van Horn v. Trickey</u>, 840 F.2d 604, 606 (8th Cir. 1988). "Eighth Circuit law has long required that any class action settlements be 'fair, reasonable, and adequate.'" <u>Wireless Tel.</u>, 2004 U.S. Dist. LEXIS 23342, at *24, quoting <u>In re Texas Prison Litig.</u>, 191 F.R.D. 164, 172 (W.D. Mo. 1999); <u>See also</u> <u>In re IBP Sec. Litig.</u>, 328 F. Supp. 2d 1056 (D.S.D. 2004).

The fairness of a proposed compromise is determined by, among other things, weighing plaintiff's likelihood of success on the merits against the amount of the relief offered in the settlement. Carson v. American Brands Inc., 450 U.S. 79, 88 n.14 (1981); Van Horn, 840 F.2d at 607. The Supreme Court has cautioned, however, that in determining whether to approve a settlement, courts should "not decide the merits of the case or resolve unsettled legal questions." Carson, 450 U.S. at 88 n.14. See also Grunin v. Int'l House of Pancakes, 513 F.2d 114, 123-24 (8th Cir. 1975).

The Eighth Circuit focuses on several factors in determining whether a settlement warrants approval:

> A District Court is required to consider four factors in determining whether a settlement is fair, reasonable, and adequate: (1) the merits of the plaintiff's case, weighed against the terms of the settlement; (2) the defendant's financial condition; (3) the complexity and expense of further litigation; and (4) the amount of opposition to the settlement. Grunin, 513 F.2d at 124 (citations omitted); see also Van Horn v. Trickey, 840 F.2d 604, 607 (8th Cir. 1988). The district court need not make a detailed investigation consonant with trying the case; it must, however, provide the appellate court with a basis for determining that its decision rests on "well-reasoned conclusions" and is not "mere boilerplate." Van Horn, 840 F.2d at 607 (citations omitted).

Wireless Tel., 396 F.3d at 932-33. Petrovic, 200 F.3d at 1150; IBP, Inc., 328 F. Supp. 2d at 1063; Van Horn, 840 F.2d at 607; Holden, 665 F. Supp. at 1407.

In addition, courts elsewhere have held that there is a presumption of fairness when a settlement is negotiated at arm's length by well informed counsel. Weinberger v. Kendrick, 698 F.2d 61, 74 (2d Cir. 1982); In re Sumitomo Copper Litig., 189 F.R.D. 274, 280 (S.D.N.Y. 1999). Following its appointment as Lead Counsel and before filing the Amended Complaint, Lead Counsel conducted an investigation of the claims, including interviews with over a dozen former employees who provided details to the overcount and accounting schemes. In addition, Charter's financial

reports and its restatement, were analyzed by an accounting firm to discern the pattern of accounting violations. The impact of various disclosures on the price of Charter's stock was measured by damage consultants. Gross Decl. ¶¶ 33, 34, 42.

The investigation continued after filing of the Amended Complaint, and included interviews (through counsel) with David McCall, former Divisional Vice President, one of the defendants who had pled guilty to participation in the customer overcount scheme. McCall provided details of meetings at which the scheme was discussed. Gross Decl. ¶¶ 72-74. Other former employees were interviewed as well. Id. at ¶ 75.

Thus, after briefing motions to dismiss, when defendants indicated an interest in possible resolution of the case, Lead Counsel was knowledgeable about the strengths and weaknesses of the claims. The negotiation process was enhanced by selection of a former judge, the Hon. Edward A. Infante, who was experienced in these types of cases. Gross Decl. ¶¶ 76,78-79.

In order to insure the appropriateness of the Settlement (and to assist continued pursuit of claims against non-settling defendants Andersen, Motorola and Scientific-Atlanta), Lead Counsel conducted a focused due diligence discovery program. This involved analysis of several hundred thousand pages of electronic and paper documents produced by Charter, and interviews with 10 defendants and former employees. Gross Decl. ¶ 77. During the course of this due diligence program, Lead Plaintiff was able to reach a settlement with Andersen (for $2,250,00) as well. Gross Decl. ¶¶ 77, 101-05.

Based the Court's experience with Lead Counsel throughout this litigation, as well as all of the above, the Court is convinced the Settlement was reached by well informed and experienced counsel. See In re Visa Check/MasterMoney Antitrust Litig., 297 F. Supp. 2d 503, 509 (E.D.N.Y.

9

2003) (approving settlement where "[e]xperienced and able counsel on all sides fought aggressively

. . . and negotiated feverishly . . . to produce the Settlement . . .").

### 1. Merits of Plaintiffs' Case Balanced By The Terms of the Settlement

It is estimated that the Settlement represents at least between 32% and 93% of estimated

damages, assuming that recovery can be obtained from three different "disclosure dates," November

1, 2001, July 18, 2002, and August 18, 2002. Gross Decl. ¶¶ 185-88. If damages were limited to

the two disclosures at the end of the Class, the Settlement represents more than 100% of the damages

recoverable by Class Members likely to file claims on the Settlement Fund. Id. at ¶¶ 194, 198.

Under either scenario, the Settlement is well above the average 5.5%-6.2% of estimated losses

recovered in securities fraud class in settlements since 1995. See In re Rite Aid Co. Sec. Litig., 146

F. Supp. 2d 706, 715 (E.D. Pa. 2001).

This analysis presumes that Lead Plaintiff would have prevailed on its claims at trial and on

appeal. However, Lead Plaintiff recognized that any litigation is fraught with risk, and that this

litigation was no different. Based on its investigation, review of documents, and interviews with key

witnesses, Lead Counsel concluded that there was a significant likelihood of demonstrating that

Charter personnel engaged in a concerted effort to inflate the Company's customer count. However,

the best evidence of this misconduct, i.e., orders from senior personnel to "hold disconnects" until

after the close of the quarter, and to otherwise "manage" disconnects, was for a limited time period -

from, at most, May 2001 through December 2001. Gross Decl. ¶¶ 11, 73, 119.

Moreover, defendants would have asserted that regardless of these instructions to hold or

"manage" disconnects, the number of accounts actually effected was immaterial. As of September

2001, the number of acknowledged "managed disconnects" totaled approximately only 60,000 to

90,000 customers, and increased to over 120,000 by the end of the year. However, Charter had over 6 million subscribers. Gross Decl. ¶ 129. In response, Lead Plaintiff asserted that regardless of the total number of subscribers, the number of "managed discounts" was sufficient to significantly inflate Charter's reported growth rate. Id. ¶ 130.

Moreover, defendants insisted that while some of these "managed disconnect" customers had requested termination--and should not have been counted--a significant portion in fact were simply late in their payments, and a possibility remained that they would want to resume their services. Gross Decl. ¶ 131.

With respect to the over $400 million in accounting claims, Lead Counsel concluded that the best evidence of manipulation involved the kickback schemes with Scientific-Atlanta and Motorola in the fourth quarter of 2000. However, this accounted for only $17 million of the over $400 million restatement. Gross Decl. ¶¶ 112, 167-73.

With respect to the largest category of the restatement, improperly capitalized customer service representative costs, defendants would have argued that this arose not from deliberate manipulation, but from internal control lapses exacerbated by the Company's significant acquisitions that occurred during the Class Period. In essence, the issue was not whether such costs could be capitalized at all, but rather what portion could be legitimately capitalized and whether there was proper documentation. Gross Decl. ¶¶ 112, 138-50. Defendants would have further argued that its other revenue and expense restatements resulted from poor documentation, not manipulation, and that the Securities and Exchange Commission had previously approved its accounting policies for these matters. Gross Decl. ¶¶ 151-66.

Lead Plaintiff also faced risks in proving "loss causation," i.e., the amount by which Charter's stock price declined because of fraud-related disclosures, rather than other events. See Lentell v. Merrill Lynch & Co., 396 F. 3d 161 (2d Cir. 2005). By way of example, Lead Plaintiff would have pointed to the November 1, 2001 announcement of a significant decline in Charter's customer growth rate, and the 13.29% ($1.88 per share) decline in the price of its stock, as indicative of the impact its overcount scheme had on Charter's stock price. Gross Decl. ¶ 187. Defendants undoubtedly would have countered that the decline on this day was due to other factors, including forecasts of declining operating results. Id. They also would have sought to undercut loss causation by noting that when Charter announced in February 2002 that 120,000 accounts were being written off, its stock price went up, not down. Gross Decl. ¶ 197.

The Class also faced significant risks in proving the degree to which the Company's alleged accounting scheme impacted its stock price. The entire decline of Charter stock linked to accounting related disclosures, i.e., a July 18, 2002 Merrill Lynch downgrade, and the August 16, 2002 announcement of a Grand Jury investigation, was only $0.70 per share. Moreover, defendants argued that the primary reasons for the Merrill Lynch downgrade were Charter's heavy debt and absence of "free cash flow" (a different measure than operating cash flow), neither of which were directly related to the fraud. Gross Decl. ¶ 187.

Thus, while Lead Plaintiff remained confident of ultimately prevailing, there were clearly other hurdles to overcome. As noted in Wireless Tel., 2004 U.S. Dist. LEXIS 23342, at *31, such uncertainties:

> [S]trongly indicate that the value of this settlement is substantial and brings real and
> immediate benefits to the settlement class. While they may well not get anything if

the case were to go forward or, if they did receive some benefits, may well not receive anything until years into the future after millions of dollars have been spent.

## 2. Charter's Financial Condition

Even if Lead Plaintiff prevailed on all these claims, and overcame the loss causation challenges, there were considerable risks regarding its ability to collect any sizable judgment from Charter. Indeed, but for the Settlement, Charter may have been forced into bankruptcy simply by an inability to renegotiate its credit lines. Gross Decl. ¶¶ 201-06.

For the six months ended June 30, 2004, the last reported results prior to finalization of settlement negotiations, Charter sustained a significant loss, and was facing the prospect of paying off debts in the near future that clearly outstripped its available liquid assets. Charter had a staggering $18.5 billion in long term debt. Annual interest payments on the debt were so large that the Company acknowledged current cash flow could not sustain operations and satisfy upcoming principal repayment obligations for 2005 and thereafter. In addition, management at the Company has undergone significant change, and all of its senior officers have recently resigned. Gross Decl. ¶¶ 8, 204.

There were similar risks in collecting any sizable judgment from Andersen. The accounting firm has ceased doing business, and is exposed to billions of dollars in claims from other lawsuits. Gross Decl. ¶ 103.

## 3. The Complexity and Expense of Further Litigation

"The possible length and complexity of further litigation is a relevant consideration to the trial court in determining whether a class action settlement agreement should be affirmed." Wireless Tel., 2004 U.S. Dist. LEXIS 23342, at *39. See also Petrovic, 200 F.3d at 1152. Continued

litigation would likely take years, requiring the expenditure of millions of dollars. Moreover, the insurance policies, which are funding the cash portion of the Charter settlement, would have been significantly diminished by the defendants' attorneys fees. In fact, the first $25 million policy, and a portion of the second policy, was exhausted before the mediation began. Gross Decl. ¶ 78. "In contrast to the delay and uncertainty attendant with such litigation, the Settlement Agreement provides substantial and immediate benefits." Wireless Tel., 2004 U.S. Dist. LEXIS, at *40. See also IBP, Inc., 328 F. Supp. 2d at 1064 (court approved settlement, which occurred prior to discovery, and noted the additional resources both parties would have spent on motions for class certification, summary judgment and discovery).

### 4. The Amount of Opposition to the Settlement

Three objections to the Settlement have been filed. Thirty five individuals sought exclusion. The "opt-outs" purchased approximately 60,000 Charter shares during the Class Period, representing 0.00013% of the 454 million shares of Charter traded during the Class Period.

In evaluating these objections, the Court notes the constituency of the Class, and the absence of objections from other large institutional investors who purchased Charter stock during the Class Period. Objectors John R. Evans, Michael W. McCulley and Carl Rinna essentially question the Plan of Allocation's treatment of claims arising from purchases made in 1999. Following examination of the three objections to the Settlement, the Court is compelled to reject them. Each objector is an investor who purchased Charter shares at the beginning of the Class Period in 1999. Each complains that the Plan of Allocation affords them only modest compensation. As such, the objectors do not really challenge the adequacy of the recovery, but rather its allocation. In any event, these objectors fail to recognize that: (a) as a matter of law, Class members could not recover for the entire decline

of Charter's stock throughout the Class Period, but only that portion which was "causally related" to the fraud; (b) the claims for this early period were by far the weakest, and, indeed, may have recovered nothing at trial; and (c) a significant portion of the Lead Plaintiff's transactions took place during this early period as well, and it has endorsed the proposed Settlement and Plan of Allocation.

This Court rejects their objections for the following reasons. Contrary to these objectors' assertions, the fact that Charter's stock price dropped from over $20 in 1999 to less than $4 by the end of the Class Period does not mean that Class members were entitled to recover for the entire decline. The federal securities laws limit damages to those losses that can be causally linked to the fraud, not simply the loss of investment value. See Dura Pharma., Inc. v. Broudo, 125 S. Ct. 1627, 1633 (2005). In Dura, the plaintiffs asserted that merely showing that defendants had issued false statements which inflated the price of a stock at the time of purchase was sufficient to satisfy "loss causation." The Supreme Court held otherwise, noting:

> If the purchaser sells later after the truth makes its way into the market place, an initially inflated purchase price *might* mean a later loss. But that is far from inevitably so. When the purchaser subsequently resells such shares, even at a lower price, that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changes in investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price.

125 S. Ct. 1631-32 (emphasis in original). As detailed in the Gross Decl. ¶¶ 183-98, this case had significant loss causation hurdles, most notably, that Charter's stock price *rose* when it issued a "corrective disclosure" on February 11, 2002, i.e., that it was writing off over 120,000 accounts (all of which had been the subject of the "managed disconnect" practice). When the Company announced it was being investigated by a Grand Jury, its stock price fell, but only by $0.20 per share. It had fallen $0.50 a share one month before when the stock was downgraded by Merrill Lynch.

Nonetheless, by impressing upon defendants that their exposure was even larger because of an earlier decline in the price of Charter stock on November 1, 2001, which followed the announcement of lower customer growth rates, Lead Plaintiff was able to recover $144,000,000 from a company with no earnings. <u>See</u> Gross Decl. ¶¶ 187, 194, 197.

Kathleen R. O'Conner's objection to the Settlement is procedurally defective. <u>See</u> Supp. Decl. Ex. 11. She opted out of the Class, and therefore is not bound by its terms. She may pursue her claims individually. <u>See</u> <u>Jenson v. Continental Fin. Corp.</u>, 591 F.2d 477, 482 n.7 (8th Circuit 1979) ("Opt-outs . . . are not members of the class and hence are not entitled to the protection of Rule 23(e)" (citations omitted)). Thus, the Court need not consider her objection.

Assuming arguendo her objection is not procedurally defective, the objection is still unfounded. As O'Conner notes, during "late 2001 through early 2003," while Charter officers were touting the stock to employees, "senior executives also continued to exercise their options to *purchase* more shares." Supp. Decl. Ex. 11 at 2 (emphasis supplied).[1] Defendants would have cited such purchases as evidence of their good faith belief that Charter stock was not illegally inflated.

This Court believes Lead Plaintiff achieved an excellent result in a complex action, where the risk of obtaining a significantly smaller recovery, if any, was substantial. The Indictment of several Charter officers, and restatement of financial results, were partially beneficial. Notably, however, despite the restatement, the SEC did not fine the Company for any accounting matters, consistent

---

[1] On July 17, 2002, the day before the Merrill Lynch report, <u>The Wall Street Journal</u> reported: "No insider has reported to the SEC the sale of any Charter shares this year." After noting the buying by insiders, the paper quoted an expert researcher on insider trading: "It's strange that Charter seems to stand out as the one [cable] company where the insiders are stepping up and purchasing shares . . . The fact that there are so many [buyers] is definitely an encouraging sign." Tony Cooke, *Inside Track*, WALL ST. J., July 17, 2002, at sec. B; p. 11; col. 5 Supp. Decl., Ex. 16.

with the Company's defense that the restatement was triggered by the discovery of errors attributable to mismanagement and poor internal controls - not deliberate fraud. Moreover, the Indictment focused on customer count inflation for several months during 2001, a relatively small portion of the Class Period.

Moreover, both of these matters provided minimal aid to Lead Plaintiff in establishing the element of "loss causation," i.e., that Charter's stock price fell because of revelations related to these matters. When the Company wrote off the inflated customers, Charter's stock price rose. Finally, there were significant risks regarding collection of any significant judgment, since Charter had no earnings and enormous debt. By negotiating for part of the Settlement in securities, Lead Plaintiff materially increased the amount of the recovery without crippling the financially strapped Company.

## B.     THE PLAN OF ALLOCATION

The Plan of Allocation, as fully described in the Notice, was formulated in consultations among Lead Plaintiff, Lead Counsel and damage experts, ensuring its fairness and reliability. Gross Decl. ¶¶ 207-12. The Plan takes into account differences in likelihood of recovery for different portions of the Class Period. Accordingly, some shareholders may benefit more from the Settlement than others depending upon when they purchased Charter shares, and if and when they sold those shares. This formula is fair and reasonable, as there is no rule that a settlement benefit all class members equally. Kincade v. General Tire & Rubber Co., 635 F.2d 501, 506 n.5 (5th Cir. 1981). Indeed, it is appropriate for interclass allocations to be based upon, among other things, the relative strengths and weaknesses of class members' individual claims and the timing of purchases and sales of the securities at issue. See Rubenstein v. Republic Nat'l Life Ins. Co., 74 F.R.D. 337, 349 (N.D. Tex. 1976).

The Court also believes Lead Plaintiff and its Counsel acted fairly in developing the Plan of Allocation, and that the proposed Plan of Allocation is fair and reasonable. The Plan of Allocation will therefore be approved by the Court. See White v. NFL, 822 F. Supp. 1389, 1420-24 (D. Minn. 1993), aff'd, 41 F.3d 402 (8th Cir. 1994); BankAmerica, 227 F. Supp. 2d at 1104; In re Chronimed Inc. Sec. Litig., Master File No. 01-1092, 2004 U.S. Dist. LEXIS 13327, at *6 (D. Minn. June 21, 2004); In re The St. Paul Cos. Inc. Sec. Litig., No. 02-3825, 2004 U.S. Dist. LEXIS 15962, at *12 (D. Minn. Aug. 13, 2004). A plan of allocation "need only have a reasonable, rational basis, particularly if recommended by 'experienced and competent' class counsel." In re American Bank Note Holographics, 127 F. Supp. 2d 418, 429-30 (S.D.N.Y. 2001) (citation omitted).

## C. CERTIFICATION OF A SETTLEMENT CLASS

Consistent with the terms of the Settlement, and the Order of Preliminary Approval dated February 15, 2005, Lead Plaintiff also requests that the Court grant "final" certification of a Settlement Class consisting of:

> All persons who purchased or otherwise acquired the common stock of Charter during the period November 8, 1999 through August 16, 2002, inclusive. Excluded from the Settlement Class are the Defendants, and their corporate affiliates; any officers or directors of Charter; or members of their immediate families, and their heirs, successors and assigns; and any entities controlled directly or indirectly by Paul G. Allen.

In determining whether to certify a class in the context of a settlement, this Court must consider whether the proposed settlement class meets the requirements under Rule 23. Fed. R. Civ. P. Rule 23(a) sets out four requirements for a class action:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the

interests of the class.

See Amchem Prods., Inc. v. Windsor, 521 U.S. 591 (1997). In this case, the Court finds the Class easily satisfies these requirements, each of which is discussed below.

### 1. Numerosity

Rule 23(a)(1) requires that the members of the class be sufficiently numerous such that joinder of all of them in a single action is impracticable. "Satisfaction of the numerosity prong does not require that joinder be impossible, but only that plaintiffs will suffer a strong litigational hardship or inconvenience if joinder is required." Carpe v. Aquila, Inc., 224 F.R.D. 454, 457 (W.D. Mo. 2004) (citation omitted). As evident from the substantial volume of Charter shares traded during the Class Period, the proposed Settlement Class here consists of several thousand investors who are geographically dispersed, making joinder impracticable. Thus, the Settlement Class easily satisfies the numerosity requirement.

### 2. Commonality

Rule 23(a)(2)'s "commonality" requirement is satisfied if a claim arises out of the same legal or remedial theory. However, as noted in Petrovic, 200 F.3d at 1148, "the interests of the various plaintiffs do not have to be identical to the interests of every class member; it is enough that they share common objectives and legal or factual positions. (Internal quotations marks and citations omitted). Accord Paxton v. Union Nat'l Bank, 688 F.2d 552, 559 (8th Cir. 1982).

Under Rule 23(b)(3), this Court must also find that common questions of law or fact predominate over any individual questions, and that a class action is superior to other available methods of adjudication. Carpe, 224 F.R.D. at 458. Courts repeatedly have held that common questions regarding defendants' liability are appropriate for class-wide treatment, even if there are

individual differences in Class members' damages. In re Select Comfort Corp. Sec. Litig., 202 F.R.D. 598, 603 (D. Minn. 2001). Here, Lead Plaintiff charges that defendants engaged in a fraudulent scheme, the result of which was the inflation of Charter's stock price. Carpe, 224 F.R.D. at 458. Moreover, the litigation of this case to date demonstrates its manageability and superiority to individual adjudication of Class members' claims. Select Comfort, 202 F.R.D. at 611.

Lead Plaintiffs have alleged overwhelming common questions of law and fact with respect to, *inter alia*, whether the defendants violated securities laws; whether the defendants acted recklessly or intentionally in reporting inflated subscriber numbers and false financial results; whether defendants acted with scienter; and the extent to which the Class members have sustained damages. See, e.g., Carpe, 224 F.R.D. at 457. Accordingly, the Court concludes the requirement of commonality has been met.

### 3. Typicality

In order to satisfy the typicality requirement of Rule 23(a)(3), Lead Plaintiff must show that its claims are typical of the class' claims - that its grievances are similar to those of other class members. Alpern v. UtiliCorp United, 84 F.3d 1525, 1541 (8th Cir. 1996). Here, Lead Plaintiff, on behalf of all members of the Class, sought to recover damages for losses arising out of the same course of conduct, and uniformly affecting all members of the Class. See, e.g., Carpe, 224 F.R.D. at 457. Therefore, the typicality requirement is satisfied.

### 4. Adequacy

Rule 23(a)(4) requires that representatives of the class be "adequate." To meet this criterion, the representative Lead Plaintiff's interests must be consistent with, and not antagonistic to, those of the Class. Moreover, Lead Counsel must be qualified, competent and diligent. See, e.g., Bishop v.

Committee on Professional Ethics & Conduct of Iowa State Bar Ass'n., 686 F.2d 1278, 1288 (8th Cir. 1982); Carpe, 224 F.R.D. at 458; Paxton, 688 F.2d at 562-63.

As indicated by the affidavit of Joseph Stocke, a managing director of StoneRidge, Lead Plaintiff has diligently championed the interests of the Class throughout the litigation. It has also retained counsel well experienced in federal class action securities litigation. The Court concludes the representatives of the class are more than adequate. For all of the reasons stated above, this Court will certify the proposed Settlement Class.

## D.    ATTORNEY'S FEES

Lead Counsel also seeks an award on behalf of all plaintiffs' counsel of 20% of the Settlement Fund. Lead Counsel and plaintiffs' law firms collectively invested 13,633.70 hours in this case, with a lodestar of $5,211,563.67, litigating this case for over 2 ½ years without compensation.[2] Lead Counsel suggests, and this Court agrees, the fee requested is particularly reasonable given the risks undertaken, the quality of the services rendered, the efficiency of the litigation, and the excellent results achieved.

---

[2] See Fee and Expense Compendium, Ex. A ("Fee and Exp. Comp"). Exhibit B thereto breaks down that time into 14 different categories. Each participating firm's time, rates, and qualifications are included at Exs. 1-25 thereto.

### 1.    Legal Standard

The Supreme Court has long recognized that "a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." Boeing Co. v. Van Gemert, 444 U.S. 472, 478 (1980). The amount of the fee award is within the sound discretion of the district court. Petrovic v. Amoco Oil Co., 200 F.3d 1140, 1156 (8th Cir. 1999); Grunin v. Int'l House of Pancakes, 513 F.2d 114, 126 (8th Cir. 1975).

The purpose of the common fund doctrine is to fairly and adequately compensate class counsel for services rendered and to "prevent the unjust enrichment of persons who benefit from a lawsuit without shouldering its costs." Boeing, 444 U.S. at 478; Catullo v. Metzner, 834 F.2d 1075, 1083 (1st Cir. 1987). Indeed the Supreme Court has emphasized that private securities actions, such as the instant action, provide "'a most effective weapon in the enforcement of the securities laws and are 'a necessary supplement to [SEC] action.'" Bateman Eichler, Hill Richards, Inc. v. Berner, 472 U.S. 299, 310 (1985) (quoting J.I. Case Co. v. Borak, 377 U.S. 426, 432 (1964)).

There are two recognized methods of computing attorney fee awards. The "percentage" approach focuses principally upon the amount recovered, and awards a percentage of that recovery for fees. As courts have routinely recognized, this approach most closely aligns the interests of the lawyers with the class, since the more recovered for the class, the more the attorneys stand to be paid. Johnston v. Comerica Mortgage Co., 83 F. 3d 241, 244 (8th Cir. 1996); In re BankAmerica Corp. Secs. Litig., 228 F. Supp. 2d 1061, 1064 (E.D. Mo. 2002). This approach is also consistent with arrangements in the market place for contingency cases, where the individual client generally agrees to a fee based on amount recovered. See Missouri v. Jenkins, 491 U.S. 274, 285 (1989).

Under the second method, known as the "lodestar" approach, the court awards a premium or "multiplier" to the sum of the total hours invested by attorneys multiplied by their hourly rate. The Eighth Circuit has stated that a district court may use either the percentage method or the lodestar method. See Johnston v. Comerica Mortgage Co., 83 F.3d 241, 244-46 (8th Cir. 1996). The Eighth Circuit has approved the percentage-of-recovery methodology to evaluate attorneys' fees in a common-fund settlement such as this. See Petrovic v. Amoco Oil Co., 200 F.3d 1140, 1157 (8th Cir.1999). This Court in its discretion will use the percentage method to award fees in this case.

The fee requested in this case--20% of the Settlement Fund--is within the range of fees awarded by courts in this Circuit. Moreover, the requested fee is equal to or below what courts in this Circuit commonly award in common fund cases. Petrovic, 200 F.3d at 1158 (24%); In re U.S. Bancorp, 291 F.3d 1035 (8th Cir. 2002) (36%); Engineering Animation (33%); IBP, Inc. (28%).[3]

Likewise, courts around the country have awarded attorneys' fees of 20% or more. See In re Warner Communs. Sec. Litig., 618 F. Supp. 735, 749 (S.D.N.Y. 1985) (observing that "[t]raditionally, courts in this Circuit and elsewhere have awarded fees in the 20-50% range in class actions"), aff'd, 798 F.2d 35 (2d Cir. 1986). In Rite Aid, the Third Circuit cited several studies conducted by Professor John Coffee of Columbia Law School, that supported a proposed award of 25% of the $126.6 million settlement in that case:

> [T]he District Court found persuasive three studies referenced by Professor Coffee:
> one study of securities class settlements over $10 million that found an average

---

[3]In re Monosodium Glutamate Antitrust Litig., 2003 WL 297276 at *3 (D. Minn. Feb. 6, 2003) (awarded class counsel 30% of the $81.4 million settlement fund after costs and expenses); KK Motors v. Brunswick Corp., No. 98-2307, Order and Judgment (D. Minn. filed Mar. 6, 2000) (awarded one-third of the $30 million settlement fund.); In re LaserMaster Technologies, Inc. Sec. Litig., No. 4-95-631, Order (D. Minn. Oct. 10, 1997) (awarded class counsel one-third of the settlement fund).

> percentage fee recovery of 31%; a second study by the Federal Judicial Center of all
> class actions resolved or settled over a four-year period that found a median
> percentage recovery range of 27-30%; and a third study of class action settlements
> between $100 million and $200 million that found recoveries in the 25-30% range
> were "fairly standard." [*Rite Aid*, 269 F. Supp.] at 610. We see no abuse of discretion
> in the District Court's reliance on these studies [in granting an award of 25%].

396 F.3d at 303. On remand, the district court reaffirmed the 25% award, which resulted in a

multiplier of 6.96. In re Rite Aid Corp. Sec. Litig., MDL Dkt. No. 1360, Master File No. 99-1349,

2005 U.S. Dist. LEXIS 4718, at *9, 2005 WL 697461 at *2 (E.D. Pa. Mar. 24, 2005).

The request for attorneys' fees of 20% of the Settlement Fund falls below the average of fee

awards in a study of securities class actions conducted by National Economic Research Associates,

("Regardless of case size, fees average approximately 32 percent of the settlement.") Martin, pp. 12-13,

Supp. Comp. Ex. 7. Furthermore, in many cases involving settlements in excess of $100 million, fees

awards have exceeded 20%. See e.g., In re Rite Aid Corp. Secs. Litig.,146 F. Supp. 2d 706 (E.D. Pa.

2001) ($193 million recovery; 25% of settlement); In re Oxford Health Plans, Inc. Sec. Litig., MDL, No.

1222, Order and Final Judgment (S.D.N.Y. June 12, 2003) ($300 million; 28% of settlement); In re

American Continental Corp./Lincoln Sav. & Loan Sec. Litig., MDL No. 834, Fee Order (D. Ariz. July 24,

1990) ($250 million recovery; 26.6% of settlement); In re Brand Name Prescription Drugs Antitrust Litig.,

No. 94 C897, 2000 WL 204112 (N.D. Ill. Feb. 19, 2000) ($685  million recovery; 25% of settlement); In

re Informix Corp. Sec. Litig., No. 1289-CRB, Final Judgment and Order (N.D. Cal. filed Oct. 29, 1999)

($132 million recovery; 30% of settlement); In re Ikon Office Solutions, Inc., 194 F.R.D. 166 (E.D. Pa.

2000) ($111 million recovery; 30% of settlement); In re Lease Oil Antitrust Litig.,186 F.R.D. 403 (S.D.

Tex. 1999) ($190 million recovery; 25% of settlement); Kurzweil v. Philip Morris Cos., Inc., Nos. 94 Civ.

2373, 94 Civ. 2546, 1999 WL 1076105 (S.D.N.Y. Nov. 24, 1999) ($123 million recovery; 30% of

settlement); In re Combustion, Inc., 968 F. Supp. 1116 (W.D. La. 1997) ($127 million recovery; 36% of

settlement); In re Sumitomo Copper Litig., 74 F. Supp. 2d 393 (S.D.N.Y. 1999) ($116 million 27.5% of settlement); In re Home-Stake Prod. Co. Sec. Litig., MDL No. 153, Final Judgment (N.D. Okla. filed Jan. 2, 1990) ($185 million recovery; 30% of settlement); In re Prudential Sec. Ltd. P'shps Litig., 912 F. Supp. 97 (S.D.N.Y. 1996); $110 million; 27% of settlement); In re Vitamins Antitrust Litig., No. 99-197 (TFH), MDL No. 1285, 2001 U.S. Dist. LEXIS 25067, 2001 WL 34312839 (D.D.C. 2001) ($385 million recovery; 34% of settlement); In re Waste Mgmt., Inc. Sec. Litig., No. 97-7709, 21 Class Action Rep. 263 (Order) (N.D. Ill. filed Sept. 17, 1999)) ($220 million recovery; 20.8% of settlement); In re Dollar Gen. Corp. Sec. Litig., No. 01-388 Order(M.D. Tenn. filed May 24, 2002) ($162 million recovery; 21.6% of settlement); In re Sunbeam Sec. Litig., 6 F. Supp. 2d 1323 (S.D. Fla. 2001) ($140.75 million recovery; 26.3% of settlement).

Courts have also stated that the percentage awarded should not be computed on a "sliding scale," i.e., decreasing the percentage as the recovery increases. As noted in Rite Aid :

> This position [that the percentage of recovery devoted to attorneys fees should decrease as the size of the overall settlement or recovery increases] . . . has been criticized by respected courts and commentators, who contend that such a fee scale often gives counsel an incentive to settle cases too early and too cheaply.

396 F.3d at 303, quoting In re Cendant Corp. Litig., 264 F.3d 201, 284 n.55.

## B. Results Achieved in Light of Risks Undertaken

The results achieved in light of the risks undertaken is an important factor in computing the attorneys' fees award. See, e.g., BankAmerica, 228 F. Supp. 2d at 1064. Securities fraud class actions are by their nature, complex and difficult to prove. See In re Computron Software, 6 F. Supp. 2d at 317. This case was no exception.

To succeed on its claims under the 1934 Exchange Act, Lead Plaintiff had to establish that each defendant was responsible for an omission or a misstatement that was material; that the statement or

omission caused damage to the Class; and that defendants acted with scienter. SC Indus., Inc. v. Northway, Inc., 426 U.S. 438 (1976); Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976).

In order to establish the first element of proof, i.e., that Charter issued false statements, Lead Counsel had to understand the Company's practices for terminating or extending customers who were delinquent in their payments (including aging of receivables, accounting reserves for bad debt, "truck" orders, and the like). Lead Counsel also had to master issues involving capitalization of customer service representatives' salaries; accounting for contracts with third parties to solicit new customers; and whether it was appropriate to recognize payments received for the promotion of new cable channels when the service was first provided rather than over the course of the programming license. Gross Decl. ¶¶ 136-75. See Petrovic, 200 F.3d at 1152 (complexity of case is a factor in determining fees).

There were considerable risks in establishing that Charter's conduct was fraudulent. Gross Decl. ¶¶ 111-14. Defendants asserted that most of the customer overcount resulted from a legitimate business practice of "managing disconnects," that is, counting customers as "active" even though they were delinquent, until several efforts had been made by sales personnel to encourage payment and/or renewal. Gross Decl. ¶¶ 116-38.

Moreover, with respect to the accounting claims, there was uncertainty whether the violations arose from deliberate efforts to manipulate the results, or poor internal controls that resulted from Charter's rapid expansion early in the Class Period following several major acquisitions. Gross Decl. ¶¶ 136-166. While there could be no dispute that the lackback transactions were fraudulent, they contributed only $17 million of over $400 million that Charter had to restate. Gross Dec. ¶¶ 167-7

Lead Plaintiff would have benefited from the restatement and guilty pleas by several senior executives with respect to these liability issues. However, as previously discussed, there remained

significant risks in proving "loss causation," i.e., that the losses sustained by Class Members were caused

by Charter's inflated customer count and cash flow, rather than by the Company's inability to adjust to

competition from satellite tv companies while servicing its enormous debt load.

> Loss causation has to do with the relationship between the plaintiff's investment loss
> and the information misstated or concealed by the defendant. If that relationship is
> sufficiently direct, loss causation is established; but if the connection is attenuated, or
> if the plaintiff fails to demonstrate a causal connection between the content of the
> alleged misstatements or omissions and the harm actually suffered, a fraud claim will
> not lie.

See Lentell v. Merrill Lynch & Co., 396 F.3d 161, 174 (2d Cir. 2005) (Internal citations and

quotations omitted).

Indicative of the loss causation issues Lead Plaintiff faced, when Charter wrote off 120,000

customers in February 2002 following unwinding of the customer overcount scheme, Charter's stock

price climbed. Gross Decl. ¶ 197. Lead Plaintiff's ability to recover damages for the customer

overcount scheme was therefore at risk. While Charter's stock price subsequently dropped when it

was downgraded by Merrill Lynch on July 18, 2002, the reasons for the downgrade only partially

related to questions regarding the Company's accounting for certain labor costs. Id. ¶ 187. Thus,

defendants would have asserted that Lead Plaintiff was not entitled to recover the entire $.50 per

share decline that day. Id. at 194.

With respect to the August 16, 2002 disclosure of the Grand Jury investigation of Charter, the only

risk was whether the $.20 decline that day was "statistically significant." While Lead Plaintiff's expert

concluded that the 7.27% drop was "significant," the issue would have been subject to a battle of experts.

Id. Charter's restatement of its financial results did not occur until well after the end of the Class Period,

and had  negligible impact on its stock price, since it related to results that were well over a year old at the

time. See Robbins v. Koger Props., 116 F.3d 1441 (11th Cir. 1997) (revelation that company had

materially overcounted number of cattle came after bankruptcy had been declared, precluded finding of loss causation.).

Even if Lead Plaintiff had prevailed and established that 100% of the price decline on July 18 and August 16, 2002 was attributable to disclosures related to defendants' fraud, the recoverable damages for Class Members, assuming that 100% filed claims, would be $198 million. Gross Decl. ¶ 198. Recent studies have shown that, on average, only 50% of eligible class members file claims.[4] Conservatively assuming that 65% of eligible Class Members will file claims, the total losses for these two days would be, at most, $129 million. Id.

Lead Counsel nonetheless recovered an even larger amount for the Class. It did so by analyzing all of Charter's prior statements and focusing on the market's reaction to the Company's November 1, 2001 announcement that its "internal" customer growth rate had slipped to 1% from a previous growth rate of 2+%, and would likely remain in that range for the foreseeable future. Gross Decl. ¶ 125. While defendants would undoubtedly have asserted that this was really "old news," since Charter had announced several weeks earlier that it expected a downturn in customer growth, defendants were nonetheless persuaded to pay a substantial portion of their exposure arising from this third announcement as well. Gross Decl. ¶ 197. Moreover, the Settlement represented nearly 100% of Charter's estimate of its outside exposure, without any discount for the portion of claims likely to be filed. Gross Decl. ¶ 199.

_____

[4] See Elaine Buckberg, Todd Foster, Ronald Miller, and Stephanie Plancich, Recent Trends in Shareholder Class Action Litigation: Bear Market Cases Bring Big Settlements, (NERA Feb. 2005) (Supp. Comp. Ex. 4).

### 3. The Fee Request In Light of Fees Paid to Defendants' Counsel

The quality and vigor of opposing counsel is important in evaluating the services rendered by Lead Counsel. See IBP, Inc., 328 F. Supp. 2d at 1064. As evidenced from the appearances at the hearings in this case, Lead Counsel faced a multitude of law firms representing defendants in this litigation. Most of these firms participated in the mediation sessions as well. As stated earlier, counsel were well paid for their efforts. Gross Decl. ¶ 201.

Given the vigor with which Lead Counsel and other plaintiffs' law firms investigated claims, briefed the motions to dismiss, and negotiated the settlement, it is reasonable for Lead Counsel and the other plaintiffs' firms be as well paid as their adversaries who did not work on a contingency basis. See Spicer v. Chicago Bd. Options Exch., Inc., 844 F. Supp. 1226, 1247 (N.D. Ill. 1993) (plaintiff's counsel entitled to reimbursement at rates comparable to defendants' counsel).

### 4. Lodestar Cross-check

While the Eighth Circuit has recognized the primacy of the percentage of recovery approach, it has also endorsed use of the lodestar method as a "cross check." Petrovic, 200 F.3d at 1157; BankAmerica, 228 F. Supp. 2d at 1065.

### a. Hours Expended by Counsel and Hourly Rates

Plaintiffs' counsel and their para-professionals spent, in the aggregate, 13,633.70 hours in this case. See Fee and Exp. Comp., Exs. A-B. To arrive at the lodestar, the hours expended are typically multiplied by each attorneys' respective hourly rate. The Supreme Court and other courts have held that the hourly rate to be applied in calculating the lodestar is that which is normally charged in the community where the attorney practices. See, e.g., Blum, 465 U.S. at 895. In addition, the Supreme Court and other courts have held that the use of current rates is proper, since such rates compensate for inflation and the loss of

use of funds. In determining reasonableness of the hourly rates, the Court should also take into account the attorneys' legal reputation, experience and status. As the biographies that accompany each law firm's declaration attest, counsel are among the most prominent, experienced and well-regarded securities litigators in the nation. Thus, the hourly rates charged are reasonable here. See Missouri v. Jenkins, 491 U.S. at 283-84; BankAmerica, 228 F. Supp. at 1065 ("while the hourly rates ranging up to $695 are high for the Eastern District of Missouri, they are nonetheless within the range of reasonableness in the realm of nationwide securities class actions.").

> **b.** **Multiplier**

Computation of the total billable time is the first step under the "lodestar" method. See In re Harrah's Entertainment, No. 95-3925, 1998 WL 832574 at *5 (E.D. La. Nov. 24, 1998) ("[b]ecause counsel prosecuted this action on a contingent fee basis, the Court would rather focus on results obtained. To overly emphasize the amount of hours spent on a contingency fee case would penalize counsel for obtaining an early settlement and would distort the value of the attorneys' services."). The multiplier is intended to account for, among other things, the results achieved, the quality of representation, the complexity and magnitude of the litigation, the consequent risk of nonpayment viewed as of the time of filing the suit, and the contingent nature of the expected compensation for services rendered. In re Ivan F. Boesky Secs. Litig., 888 F. Supp. 551, 562 (S.D.N.Y. 1995).

The requested fee of 20% of the $146,250,000 recovery equates to a multiplier of 5.61 based on the lodestar to date. This falls within the range of multipliers found reasonable for cross-check purposes by courts in other similar actions, and is fully justified here given the effort required, the hurdles faced and overcome, and the results achieved. See, e.g., Rite Aid, 2005 WL 697461 at *2-*3 (multiplier of 6.96); Cosgrove v. Sullivan, 759 F. Supp. 166, 167 n.1 (S.D.N.Y. 1991) (multiplier of 8.74); Di Giacomo v.

<u>Plains All Am. Pipeline</u>, Nos. H-99-4137, H-99-4212, 2001 U.S. Dist. LEXIS 25532, at *31, 2001 WL 3463337 at 10 (S.D. Tex. Dec. 18, 2001) (multiplier of 5.3); <u>Roberts v. Texaco, Inc.</u>, 979 F. Supp. 185, 197 (S.D.N.Y. 1997) (multiplier of 5.5).

Moreover, the multiplier is based on the hours incurred to date. Had the case not been settled, considerably more time would have been necessary to complete formal discovery (particularly of third parties) and to prepare this case for trial with no assurance that the outcome would have been any more successful. Indeed, given Charter's precarious financial condition, there was a risk that the continued pendency of this lawsuit would preclude the Company from renegotiating its credit lines. Further litigation would have diminished the considerable insurance policies that were paying defendants' counsels' fees.

**5.      Public Policy Considerations**

This Court believes the requested fee is reasonable, under both the percentage and lodestar methods, and is consistent with public policy concerns promoting prompt resolution of litigation and conservation of judicial resources. Moreover, the federal securities laws are remedial in nature. To effectuate their purpose of protecting investors, the courts must encourage private lawsuits. <u>See</u> <u>Basic Inc. v. Levinson</u>, 485 U.S. 224, 230-31 (1988). The Supreme Court has emphasized that private securities actions such as this provide "'a most effective weapon in the enforcement' of the securities laws and are 'a necessary supplement to [SEC] action.'" <u>Bateman Eichler</u>, 472 U.S. at 310 (citation omitted). <u>See</u> <u>also</u> <u>Petrovic</u>, 200 F.3d at 1148 (discussing the strong public policy favoring settlement agreements, stating that "courts should approach them with a presumption in their favor.") (quoting <u>Little Rock Sch. Dist. v. Pulaski County Special Sch. Dist.</u>, 921 F. 2d 1371, 1388 (8th Cir. 1990)).

The typical class representative is unlikely to be able to pursue long and protracted litigation at his or her own expense, particularly with the knowledge that others similarly situated will be able to "free ride" on these efforts at no cost or risk to themselves. Furthermore, the significant expense combined with the high degree of uncertainty of ultimate success means that contingency arrangements are necessary to retain competent counsel. Indeed, lawyers that pursue private suits such as this on behalf of investors augment the overburdened SEC by "acting as 'private attorneys general.'" Ressler v. Jacobsen, 149 F.R.D. 651, 657 (M.D. Fla. 1992) (citation omitted). Thus, "public policy favors the granting of [attorneys'] fees sufficient to reward counsel for bringing these actions and to encourage them to bring additional such actions." Id.

**6.    Objections**

Six objections to the fee request have been filed, including three by state employee pension funds, the New York State Teachers' Retirement System ("NYS Teachers"), Public Employee Retirement System of Idaho ("PERSI"), and Pennsylvania Public School Employees' Retirement System ("PPSERS"). The Court believes the paucity of objections validates the fairness of the fee request. In evaluating these objections, the Court has considered the constituency of the Class, and with the possible exception of the state employee pension funds, the absence of objections from other large institutional investors who purchased Charter stock during the Class Period.

This Court notes that other district courts in this Circuit have denied similar objections by these same three pension funds in granting a 25% fee from an $84 million settlement in In re Excel Energy, Inc., 2005 WL 840370 at *2 (D. Minn. April 8, 2005). The lodestar multiplier in that case was 4.7. As detailed below, many other institutional investors have endorsed fee awards of 20% or more in comparable cases.

The Court first notes that NYS Teachers have misstated the fee request. Contrary to its computation, the amount requested is not $35.2 million, but $29.25 million, of which approximately 55% will be in Charter stock and warrants. NYS Teachers question the efficiency of the litigation. However, the due diligence discovery program was conducted on an expedited basis and was concluded 12 weeks after execution of the August 5, 2004 Memorandum of Understanding ( "MOU"). It was staffed by associates, except for interviews of defendants and other key Charter employees. The discovery program served not only to confirm Lead Counsel's assumptions regarding the evidence regarding the claims being settled--which was an express pre-condition to the Settlement-- but also aided the continued prosecution of claims against the then non-settling defendants.

By focusing on the attorney time spent on the case, NYS Teachers also ignores what is a critical focus of any fee determination - the recovery achieved for the Class. As discussed below, objector's position is contrary to case law in this Circuit. See e.g., Xcel; Johnston v. Comerica Mortg. Corp., 83 F.3d 241, 245 (8th Cir. 1996).

There are also three objections to the amount of the fee request from individual shareholders, Ann Mitchell, Susan Lockshine, and Rory Valas, all of whom have objected through counsel. Valas purchased 400 shares of Charter. Valas argues the request for 20% of the settlement fund is excessive. Valas argues that if this percentage was negotiated between class counsel and lead plaintiff at the inception of the case, then this suggests Stoneridge was a mere figurehead plaintiff. Valas further argues the case was a low risk securities class action and merits a commensurate fee award. He cites In re Bristol Myers Squibb Sec. Litig. 2005 U.S.Dist. LEXIS 2917 at 25 n.8 (S.D.N.Y. Feb. 24, 2005), as nearly factually identical, particularly the company's restatement of its financials. He

argues that class counsel merely followed parallel proceedings in the newspaper and incorporated the information gleaned from public sources in their complaint. He further notes that the Merrill Lynch analyst report questioning the accounting practices here was issued on July 18, 2002, 13 days before the first complaint was filed. Thus, he argues the lawsuits were triggered by and based entirely upon the Merrill Lynch report.

Valas also argues class counsel was further assisted by the Grand Jury investigation into Charter's operations. He notes that fourteen law firms then filed complaints, drawn by the virtual certainty of a lucrative recovery. Then on April 1, 2003, Charter announced it was restating its financial reports for 2000, 2001, and 2002, thus a good settlement was virtually assured. Valas maintains the indictments of the Charter officers were "icing on the cake," making settlement a foregone conclusion. Meanwhile, the SEC was pursuing an investigation of subscriber count practices and accounting for agreements with Scientific Atlanta and Motorola, which significantly assisted the private plaintiffs here. Valas concludes that the case has all of the indicia of cases that settle quickly and easily based on publicly available information, i.e., restatement of financials, parallel SEC proceedings, and criminal indictments of corporate officers.

Valas notes that while ordinarily a lead plaintiff as the class member with the highest losses may be presumed to have a financial interest in ensuring that attorney's fees are as low as possible, that interest is offset here by the incentive award of $26,625 that class counsel requested on their behalf. He argues the incentive award is the quid pro quo for not opposing class counsel's fee request. Valas believes that a fee award of no more than 2.3 times class counsel's documented lodestar, and no more than 7.5% of the settlement fund, is appropriate here. Valas also asks the Court to scrutinize the attorney hours spent after the MOU, known as "confirmatory" discovery.

Valas believes that the hours worked after the parties had an MOU of settlement suggests that class counsel used the confirmatory discovery process as a way to pad their hours and run up their lodestar in an attempt to make their 20% fee request appear reasonable.

Ann Mitchell did not submit the transactional documentation required by the Notice concerning purchases and sales of Charter stock. For this reason, the Court will deny the objection. Mitchell argues that the request for 20% of the settlement funds is excessive, not reasonable, and comes at the expense of class members. She suggests the Court should award attorneys' fees of 12% of the settlement fund. Mitchell describes the case as a "piggy back" case in that the SEC had filed an action against Charter regarding accounting and auditing enforcement issues. She also believes there was no appreciable risk of nonrecovery, nor were there groundbreaking legal issues involved.

The Court concludes the reasonableness of the 20% fee requested in this case is confirmed by a very recent decision by a district court in this Circuit, where the court awarded 25% of an $84,000,000 recovery. Xcel, 2005 WL 840370 at *2. The cases were similar in that the 84 million dollar settlement was reached before depositions, but after document discovery, motions to dismiss, and mediation. The requested fee represented a 4.7 multiple of the lodestar. In rejecting the objections to the fee request, the court noted:

> All counsel — both those representing plaintiffs and defendants — conducted this litigation in an exemplary manner and fulfilled their obligations under Rule 1. This is the type of complex litigation that easily could have dragged on for several more years. Instead, it had a relatively short stay of two and a half years on this court's docket because counsel litigated the case efficiently and inexpensively. The lodestar of plaintiffs' counsel could easily have been much higher had not counsel cooperated with one another through the litigation and settlement process. Instead, all counsel presented a modest lodestar because they moved the case along efficiently to a just result in a remarkably short time.

Id. LEXIS, at *17, WL at *5. See also IBP, Inc., 328 F. Supp. 2d at 1065 (awarding 28% in fees where case settled before discovery and while the motion to dismiss was pending, with court making clear that it had no intention to "penalize Plaintiff's counsel for proceeding efficiently and effectively").

The court in Xcel noted a number of fee awards which granted 25% or more of the recovery. "First, courts in this circuit and this district have frequently awarded attorney fees between twenty-five and thirty-six percent of a common fund in other class actions." Id. WL at *11. The court further observed that its "award comports with attorney fee awards in other securities actions from other federal courts around the country." Id. WL at *11.

NYS Teachers asserts that the increased presence of institutional investors in securities class actions has resulted in a decline in fees requested, as well as awarded. While this is true in a select few mega-settlements, it is not a trend. The fact remains that 33% remains the fee most frequently requested. See, Elaine Buckberg, Todd Foster, Ronald Miller, and Stephanie Plancich, Recent Trends in Class Action Litigation: Bear Market Cases Bring Big Settlements, pp. 9-10 (NERA Feb. 2005).[5]

NYS Teachers cites several cases where the fee awards were less than 20%, including some of the same decisions rejected by the court in Xcel. In In re BankAmerica Secs. Litig., 228 F. Supp. 2d 1061 (E.D. Mo. 2002), the district court awarded fees of 18% on a $460 million settlement. The $82.8 million fee was granted even though the risk of limited or no recovery was quite small. Defendant BankAmerica had very "deep pockets." Moreover, the proxy fraud claims arising out of

_____

[5]This study was attached as Ex. 4 to the Supp. Comp. filed on April 15, 2005. It shows in 40% of the cases, the fees requested were 33%.

BankAmerica's merger did not require proof of scienter, an element for Rule 10b-5 fraud claims asserted here. Xcel, 2005 WL 840370 at *10.

In re Cendant Corp. Secs. Litig., 109 F. Supp. 2d 285 (D.N.J. 2000), aff'd in part, vacated in part, 264 F.3d 201 (3d Cir. 2001), after remand, 243 F. Supp. 2d 166 (D.N.J. 2003), is also inapposite. That "was a simple case in terms of liability." 264 F.3d 197. Moreover, Cendant's financial situation was much more sound than Charter's.

In re Bristol-Myers Squibb Sec. Litig., 361 F. Supp. 2d 229 (S.D.N.Y. 2005), is also distinguishable. There, the company was compelled to pay the SEC $150,000,000 to settle fraud claims. That SEC settlement coincided with settlement of the class action for twice that amount. The class action settlement in Bristol-Myers, which occurred while the dismissal of the complaint was being appealed, was driven by the company's desire to settle with the SEC. In contrast, here the SEC settled with Charter for injunctive relief only. Thus, the Court rejects the theory that the SEC settlement drove the recovery here. Finally, Lead Plaintiff here *is* a sophisticated institutional investor. This Court has no reason to question its consent to the fee request.

As to the notion that the outcome here was a foregone conclusion, referencing the government's actions, as well as Merrill Lynch's July 18, 2002 downgrade of Charter, in his Declaration addressed earlier, attorney Gross discusses the risks and hurdles in this case. The Court finds that under these circumstances, the risks undertaken and overcome, particularly relative to the size of the recovery, support an award of 20%.

As to the fact that the 20% fee requested would result in an award in excess of a "3" multiplier, as stated previously, in this Circuit, the use of a percentage method of awarding attorney fees in a common-fund case is "well established." Petrovic, 200 F.3d at 1157. Although courts may

use the lodestar to "cross check" the reasonableness of the percentage awarded, there is no requirement to do so in this Circuit. See, Xcel, 2005 WL 840370 at *12 (4.7 multiplier). In any event, "the lodestar cross-check does not trump the court's primary reliance on the percentage of common fund method." Id. LEXIS, at *40, WL at *12; Rite Aid, 396 F.3d at 306 (6.96 mutliplier; cautioning against setting fees in a "formulaic way"). See 396 F.3d at 301. Here fees of 20% of the settlement yield a 5.61 multiplier, which is within the range of multipliers awarded in comparable complex cases.

As to the objections challenging the time incurred for the due diligence discovery, the Court is convinced that Lead Counsel directed a significant due diligence discovery effort in connection with execution of the MOU, which  was an express condition of the Settlement.  The Court is also convinced the due diligence was conducted in an efficient and expedited manner.   Thus, the Court concludes the time expended in connection with due diligence should not be discounted.

The lodestar is challenged on two grounds. First, it attacks the time spent on discovery, asserting inefficient management of the due diligence program in particular, and the case in general. The argument ignores that a portion of the discovery pre-dated the due diligence program. See Supp. Decl. ¶¶ 5, 6.  Moreover, the due diligence component was efficiently staffed, solely by associates from a few firms (with the exception of partners who conducted the actual interviews).  Moreover, the entire program was completed in 12 weeks after execution of the MOU, indicative of the efficiency of the effort. Id. 7-21.  Thus, the Court believes all the discovery related time should be fully compensated.

As to the inclusion of the time incurred by several firms in preparing their initial complaints and vying for lead plaintiff, the Court notes that none of these cases were dismissed and were all

consolidated in the Amended Complaint. They provided a breadth of plaintiffs to support class certification. Several of the firms assisted in the case by providing additional personnel to review and analyze documents for preparation of the Amended Complaint and for the due diligence program. Thus, their efforts throughout the lawsuit contributed to its successful resolution.

Moreover, NYS Teachers lumps together all the firms' time into these two categories, including that of Lead Counsel (327 hours), as well as two other firms whose work product contributed to the Amended Complaint; Glancy Binkow, which filed the first action (109 hours.); and Milberg Weiss (248 hours). Both firms conducted their own independent investigations, and shared the benefits of that investigation with Lead Plaintiff. Even if the Court were to disallow the time of all the other firms, the ultimate impact on the lodestar/multiplier would not be significant, and would not warrant reduction of the percentage award requested. The total hours as adjusted would be 12,108; the total lodestar would be approximately $4.7 million. The multiplier for a 20% award would increase to 6.2, which is still within the range of awards for cases like discussed above.

The Court also concludes Susan Lockshine's objections to the notice, time of payment of fees and amount of payment to Lead Plaintiff is without merit. The Notice mailed to Class members adequately described the recovery obtained, the relevant proceeding, the attorneys' fees requested and the rights and obligations of Class members, and other information to enable a Class member to make an informed judgment as to whether to participate in the Settlement, object to it or the requested fees, or to opt out. In compliance with the Private Securities Litigation Reform Act of 1995 ("PSLRA"), the Notice also specified the number of shares Lead Plaintiff's expert estimated were damaged and represented that the recovery per share if every class member submitted a proof of claim. See 15 U.S.C. § 78u-4(a)(7)(A).

The additional details that Lockshine insists should have been included in the Notice concerning total amount of damages, and percentage of damages recovered, are not required by the PSLRA, where, as here, there is a disagreement among the parties about the average amount of damage on a per share basis. See 15 U.S.C. § 78u-4(a)(7)(B). The PSLRA requires, and the Notice (¶ 3) describes, the reasons for the disagreement — *e.g.*, the appropriate economic model for determining damages, the amount, if any, of the artificial inflation, and non-fraud related market or other forces affecting the price of Charter stock. See, Rent-Way, 305 F. Supp. at 511 (court rejected a similar objection, reasoning that the objector "demands a level of specificity not required by Rule 23(e), federal due process standards, or the PSLRA." (citation omitted)); see also Petrovic, 200 F.3d at 31.

Moreover, Lockshine is represented by counsel, who had access to papers Lead Plaintiff filed in support of settlement and fees. These papers detail the damage estimates of both defendants (100%) and Lead Plaintiff (upwards of 93% for claimants likely to file). Thus, the Court concludes the adequacy of the Notice and record supporting the Settlement is adequate.

### E.  PLAINTIFFS' COUNSEL'S EXPENSES

Counsel for all the plaintiff law firms have incurred $671,734.64 out-of-pocket expenses in prosecution of this case. Each plaintiff law firm that participated in this litigation has submitted separate Declarations attesting to the accuracy of their expenses. See Fee and Expense Compendium. These expenses, the largest of which were for experts, investigators, document reproduction, and travel related to court hearings, witness interviews, and mediation, are tallied in Exs. C-D to the Compendium. See U.S. Bancorp, 291 F.3d at 1038 (finding out-of-pocket costs awards to class counsel appropriate); BankAmerica, 228 F. Supp. 2d at 1067 (approving out of pocket expenses of over $5 million); Missouri

v. Jenkins, 491 U.S. at 295 ("[p]laintiffs' out-of-pocket costs for telephone telecopier, air and local couriers, postage, photocopying, Westlaw research, secretarial overtime, and counsels' travel expenses are routinely billed to fee-paying clients, and thus are all compensable as part of a reasonable attorney's fee").

## F.    LEAD PLAINTIFF'S APPLICATION FOR COMPENSATORY AWARD

Pursuant to 15 U.S.C. § 78u-4(a)(4), Lead Plaintiff StoneRidge seeks an award of $26,625 as reimbursement for the 88.75 hours that one of its managing directors, Joseph Stocke, expended on this litigation for the benefit of all Class Members.  As set forth in his affidavit, Supp. Comp., Ex. 2, StoneRidge is an investment advisor responsible for managing over $700 million in assets.  Stocke Aff. ¶ 1.  Stocke was personally involved in this litigation from the outset. Among other things, he reviewed the initial motion for appointment as Lead Plaintiff and was kept abreast of the investigation undertaken by Lead Counsel through weekly teleconferences. Stocke Aff. ¶¶ 2 & 9.

Stocke identified Scientific-Atlanta as the likely vendor who was involved in the kickback scheme with Charter.  This was not identified in the Indictment.  Id. ¶ 6. He also participated in the mediation efforts by both teleconference during key presentations, as well as by phone consultations during ongoing negotiations.  All demands proffered during the negotiations with Charter and Andersen were first authorized by Mr. Stocke.  Id. ¶ 12.  He also assisted in formulation of the Plan of Allocation. Id. ¶ 15.

Stocke's daily time records are reflected in his Affidavit ¶ 17.  His hourly rate of $300 is based on his annualized compensation as an investment manager for StoneRidge. Id. ¶ 18.  Reimbursement to StoneRidge for Stocke's time and services rendered for the benefit of the Class is consistent with § 27(a)(b)(4) of the PSLRA. Courts in this District have routinely approved such reimbursements. See, e.g.,

BankAmerica (compensation totaling $130,000 paid to the class representatives); U.S. Bancorp (8th Cir. 2002).

Objector Lockshine questions the $26,625 compensatory award requested by Lead Plaintiff. The Affidavit of Joseph Stocke shows that the Class clearly benefitted from the time Lead Plaintiff expended aiding the pursuit of these claims. The request is in line relative to other awards. See Xcel, 2005 U.S. Dist. LEXIS 6432, at *43, 2005 WL 840370 at *13 ($100,000 to one lead plaintiff); In re Dun & Bradstreet Credit Serv. Cust. Litig. 130 F.R.D. 366, 376 (S.D. Ohio 1990) ($215, 000 to four named plaintiffs).

## III.    CONCLUSION

Based on all of the reasons stated above and the entire record herein, the Court will: (1) certify the proposed Settlement Class; (2) deny the objections; (3) approve the Settlement; (4) approve the Plan of Allocation; and (5) award the requested (a) 20% in fees to plaintiffs' counsel, (b) $671,734.64 in expenses and (c) $26,625 Compensatory Award to Lead Plaintiff.

Accordingly,

**IT IS HEREBY ORDERED** that Lead Plaintiff's motion for Final Approval of the Settlement and Plan of Allocation is **GRANTED.** (Doc. 306)

**IT IS FURTHER ORDERED** that Lead Plaintiff's motion for attorneys' fees is **GRANTED**. (Doc. 306.)

42

**IT IS FURTHER ORDERED** that Lead Plaintff's motion for leave to file in excess of page limit is **GRANTED.** (Doc. 319.)

_____
**CHARLES A. SHAW**
**UNITED STATES DISTRICT JUDGE**

Dated this <u>30th</u> day of June, 2005.